UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VIKING GROUP, INC. and )
SUPPLY NETWORK INC., )
     Plaintiffs, )
             )   No. 1:17-cv-103
-v- )
             )   Honorable Paul L. Maloney
TERRY PICKVET, )
     Defendant. )
             )
and )
             )
TERRY PICKVET, )
             )
     Plaintiff, )
             )   No. 1:17-cv-116
-v- )
             )   Honorable Paul L. Maloney
VIKING GROUP, INC., and )
SUPPLY NETWORK, INC. )
     Defendants. )
_____)

## OPINION AND ORDER GRANTING IN PART VIKING GROUP'S MOTION FOR A PRELIMINARY INJUNCTION AND DENYING PICKVET'S MOTION FOR A PRELIMINARY INJUNCTION

Before this Court are two cases involving identical parties. In both cases, the parties raise claims arising from a noncompete agreement. Both parties have filed motions for a preliminary injunction. As the plaintiff, Viking Group wants the Court to enforce portions of a noncompete agreement. As the plaintiff, Terry Pickvet wants the Court to prevent Viking Group from enforcing the noncompete agreement. The resolution of the competing motions turns on whether Michigan law applies or whether Georgia law applies. The Court

concludes that Michigan law applies to the noncompete agreement and will grant, in part, Viking Group's motion.

## I.

Terry Pickvet worked for a subsidiary of Viking Group from late 2009 until January 23, 2017, when he submitted his resignation. Pickvet applied for a position with Atlanta Winsupply, a competitor of Viking Group, and received an offer from them.

The same day he resigned from Viking Group, Pickvet filed a lawsuit against his former employer in the Fulton County Superior Court for Fulton County, Georgia. Pickvet sought a declaration that the Noncompete Agreement was unenforceable. Viking Group removed the lawsuit to the United States District Court for Northern District of Georgia. On February 3, 2017, Judge William Duffy granted Viking Group's motion to transfer venue and transferred the lawsuit to this district. Currently pending in the *Pickvet* case, *Pickvet v. Viking Group*, No. 1:17-cv-116 (W.D. Mich.) (*Pickvet*) is Pickvet's motion for injunctive relief (ECF No. 2).

On January 26, 2017, the day that Viking Group was served with the complaint and summons from Pickvet's Georgia lawsuit, Viking Group filed its own lawsuit against Pickvet in the Kent County Circuit Court for Kent County, Michigan. Pickvet removed the lawsuit to this Court on January 30, 2017. Currently pending in the *Viking Group* case, *Viking Group v. Pickvet*, No. 1:17-cv-103 (W.D. Mich.) (*Viking Group*) is Viking Group's motion for a preliminary injunction. (ECF No. 4.)

The parties generally agree on the relevant facts. Pickvet received and signed an offer of employment from Viking SupplyNet on October 30, 2009.[1] (*Viking Group* ECF No. 5-1 PageID.50-52.) As a condition of employment, Pickvet was required to sign a noncompete and confidentiality agreement. (*Id.* PageID.51.) Pickvet signed the agreement on October 30, 2009. (*Id.* PageID.53-55.)

The Noncompete Agreement is broad in scope. The agreement was between Pickvet and the Viking Group (*Viking Group* ECF No. 5-1 PageID.53), which included all parent, subsidiary, and affiliated corporations, as well as any joint ventures, partnerships or other business entities in which the parent, subsidiaries, and affiliates participate or own, and their successors and assigns (PageID.55). The agreement generally prohibits Pickvet from "competing in any way" with Viking Group. (*Id.* PageID.53.) The prohibition precludes Pickvet from working "with, for, or hav[ing] any interest in, any organization that competes with" Viking Group. (*Id.*) The agreement not to compete extends for two years after Pickvet's employment ends. (PageID.53.) The agreement applies to the Southeastern US Sales Region, which is defined as North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, Arkansas, Tennessee, and Texas. (*Id.*)

The Noncompete Agreement contains both a forum selection clause and a choice of law provision. The choice of law provision specifies that Michigan law governs the agreement. (*Viking Group* ECF No. 5-1 PageID.53.) The document specifies that disputes

---

[1] When referencing documents in the records of the two cases, the Court will first indicate which case contains the document.

arising under the agreement "shall be filed, heard and decided in either Kent County Circuit Court or the U.S. District Court for the Western District of Michigan." (*Id.*)

Pickvet sold fire suppression products and related services. According to Pickvet, his sales territory included all of Georgia, the southern-half of Alabama, the panhandle region of Florida, and the Chattanooga and Cleveland areas of Tennessee. (*Pickvet* ECF No. 1-1 Affidavit PageID.44.) Pickvet also had one account in Lucedale, Mississippi. (*Id.*) Pickvet received an offer to work for Atlanta Winsupply selling similar products and services.

In its motion, Viking Group seeks to enforce several provisions of the Noncompete Agreement. Viking Group asks the Court to enter an injunction to prevent Pickvet from using or disclosing Viking Group's confidential information and also to prevent Pickvet from soliciting customers. Viking offers the following proposed injunction:

Until further Order of this Court, Pickvet is prohibited from:
A. Within the states of North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, Arkansas, Tennessee, and Texas:

> 1) attempting to persuade any customer, supplier, or potential customer or supplier of Viking that they should not do business with Viking, should reduce their purchases of Viking's products or services, or should do business with a competitor of Viking;

> 2) selling or aiding in the sale of any products or services that are competitive with any services or products of Viking to any customer or potential customer of Viking;

> 3) soliciting, encouraging or persuading any employee of Viking to terminate their employment with Viking or to take any action that adversely affects their ability to carry out their employment duties with Viking.

B. Retaining, disclosing to any person or entity, or using for any purpose any confidential information concerning Viking's customers, marketing strategy,

product cost, pricing information, or other business information which he obtained in the course of his employment with Viking.

(*Viking Group* ECF No. 5-9 PageID.89.)

In his proposed order attached to his motion, Pickvet ask the Court to enjoin Viking Group from "taking any steps to enforce the 2009 Agreement between the parties until the present litigation is resolved between the parties." (*Pickvet* ECF No. 2 PageID.76.)

## II.

These lawsuits come to federal court under the diversity statute. *See* 28 U.S.C. § 1132. The parties are from different states and the amount in controversy exceeds $75,000. Viking Group is a Michigan corporation. Pickvet is a citizen and resident of Georgia. In the *Pickvet* case, Viking Group states, in its notice of removal, that the value of its interest in enforcing the noncompete agreement exceeds $75,000. (*Pickvet* ECF No. 1 PageID.3) In the *Viking Group* case, Pickvet relies on Viking Group's own valuation of its interest in his notice of removal. (*Viking Group* ECF No. 1 PageID.3.)

In diversity suits, federal courts apply the substantive law of the forum state. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003)). When applying state law to a diversity action, the federal court "must follow the decisions of the state's highest court when that court has addressed the relevant issue." *Talley*, 223 F.3d at 326. Where the state's supreme court has not weighed in on the issue, federal courts must anticipate how the state's supreme court would rule by considering "all available data, including the decisional law of the state's lower courts." *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 517 (6th Cir. 2001). "'Where a state's highest

court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'  This rule applies regardless of whether the appellate court decision is published or unpublished."  *Id.* (citations omitted).

III.

The parties disagree about which state's law should govern this matter.  Pickvet insists that Georgia laws should govern.  In his motion for injunctive relief, Pickvet relies on Georgia law, including an analysis of Georgia's choice of law rules.  Viking Group contends that Michigan law applies.

At the outset, this Court must apply Michigan's conflict of law rules to the choice of law provision in the Noncompete Agreement.  As a federal court in the State of Michigan, this Court applies Michigan law to state law claims brought in diversity cases, including the state's conflict of law rules.  *See Security Ins. Co. v. Kevin Tucker & Assoc.*, 64 F.3d 1001, 1005 (6th Cir. 1995); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts.").  Also, through the forum selection clause, the parties agreed that "any dispute" arising from the Agreement must be filed, heard and decided by a Michigan court.  (*Viking Group* ECF No. 5-1 PageID.55.)

Michigan applies Section 187 of the Restatement 2d of Conflict of Laws when considering which state's law to apply to a contract.  *Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 705 (6th Cir. 2002); *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703 (Mich. 1995).  Initially, the parties must have selected a state to supply the governing

law. *Kipin Indus., Inc. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 493 (6th Cir. 1999). Michigan conflict of law rules require courts "to balance the expectations of the parties to a contract with the interests of the states involved to determine which state's law to apply." *Equitable Life Assurance Soc'y of the United States v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998) (citing *Chrysler Corp.*, 528 N.W.2d at 703). Section 187 provides

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

>> (b) application of the law of the chosen state would be contrary to the fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Chrysler Corp.*, 528 N.W.2d at 701 n.13 (quoting Restatement 2d Conflict of Laws).

Under § 187(1), the parties' choice of law in the agreement will be upheld if the "particular issue" is an issue that the parties could have resolved by explicit agreement. If the parties could not resolve the issue by agreement, then § 187(1) does not end the inquiry and § 187(2) applies. The commentary in the Restatement provides examples of issues that parties could not have determined by an explicit agreement, including the validity of their agreement. Restatement (Second) of Conflict of Laws § 187 cmt. d. The particular issue

presented here is whether the noncompete agreement is enforceable, an issue that the parties could not have resolved by agreement. *See Lifestyle Implant Ctrs., LLC v. East Bay Health, LLC*, No. 2:13-cv-735, 2013 WL 5564144, at *6-*7 (S.D. Ohio Oct. 7, 2013) (collecting and discussing cases and secondary authority); *accord Cardoni v. Prosperity Bank*, 805 F.3d 573, 581 n.7 (5th Cir. 2015) ("However, Section 187(1) is inapplicable to this case because the enforceability of restrictive covenants is generally not one which the parties could have resolved by an explicit provision in their agreement.") (internal quotation marks omitted); *Baxter Int'l, Inc. v. Morris*, 976 F.2d 1189, 1196 (8th Cir. 1992) ("We agree with the district court that section 187(1) does not apply in this instance because the parties could not have provided for the enforceability of the noncompete covenant. Only a court applying the appropriate law can assess the validity of contract terms."). Because the parties could not resolve the enforceability of the noncompete agreement by the terms of the contract, the Court must consider § 187(2).

Section 187(2) requires a court to apply the law of the state designated in the parties' agreement, unless either of two conditions exists. *See Kipin Indus.,* 182 F.3d at 493. First, under subsection 2(a), a court would not apply the parties' choice of law if the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the choice. This first condition does not apply. Viking Group is a Michigan company with its principle place of business in Grand Rapids, Michigan. (*Pickvet* ECF No. 1 PageID.2.) The Michigan Supreme Court has stated that having a principle place of business within the state and being incorporated within the state are each significant contacts that would constitute a substantial relationship. *Chrysler Corp.*, 528 N.W.2d at 704;

*see Kipin Indus.*, 182 F.3d at 494 ("First, it is clear under the Restatement that a party's place of domicile is sufficient to meet the substantial relationship test of § 187(2)(a).").

The central dispute in these motions is whether subsection 2(b) requires the Court to ignore parties' choice of law and apply Georgia law, instead of Michigan law, to determine the enforceability of the Noncompete Agreement. Under § 187(2)(b) of the Restatement, a court should not apply the law chosen by the parties if the result would be (1) contrary to a fundamental policy of the state (2) which has a materially greater interest than the chosen state in the determination of the particular interest and, (3) in the absence of an effective choice of law by the parties, would have been the state supplying the law under § 188. For the purpose of this analysis, the Court will assume that Georgia has a materially greater interest in the enforceability of the Noncompete Agreement and that Georgia law would be used if an analysis of the § 188 factors were performed. If neither of those two conclusions are correct, the Court would apply Michigan law.

The question is whether enforcing the Noncompete Agreement would be contrary to a fundamental policy of the State of Georgia. Georgia courts look to the state constitution and statutes to determine the public policy of the state. *See Murphy v. Bajjani*, 647 S.E.2d 54, 58 (Ga. 2007) ("While OCGA § 20-2-1184 establishes Georgia's public policy concerning the need to report timely to the appropriate authorities the identify of students who commit certain proscribed acts on school grounds, it does not create a civil cause of action for damages in favor of the victim or anyone else for the purported failure to report timely."); *Melton v. Georgia*, 178 S.E. 447, 448 (Ga. 1935) ("A constitutional statute cannot

be declared inoperative because [it is] opposed to public policy, since the statute itself determines public policy.").

Historically, Georgia's public policy clearly disfavored restrictive employment covenants. *Becham v. Synthes USA*, 482 F. App'x 387, 388 (11th Cir. 2012) (per curiam); *e.g., Atlanta Bread Co. Int'l, Inc. v. Lupton-Smith*, 679 S.E.2d 722, 724 (Ga. 2009) (quoting *Rakestraw v. Lanier*, 30 S.E. 735 (Ga. 1898)). Prior to 2011, Georgia's constitution prohibited the state's legislature from authorizing restrictive covenants. *Becham*, 482 F. App'x at 388. And, Georgia courts reviewed restrictive covenants in employment contracts with strict scrutiny because of the imbalance in bargaining power between employers and employees. *See Malice v. Coloplast Corp.*, 629 S.E.2d 95, 99 (Ga. Ct. App. 2006) (citation omitted).

On November 2, 2010, Georgia voters approved a constitutional amendment that allowed the state legislature to approve restrictive covenants. *Becham*, 482 F. App'x at 389. And, on May 11, 2011, the governor signed HB 30, Ga. Code Ann. § 13-8-50, *et seq.*, which contained statutory guidance for the validity and enforcement of restrictive covenants in employment. 2011 Ga. Laws Act 99. Section 5 of the Session law states that the Act "shall not apply in actions determining the enforceability of restrictive covenants entered into before" the date the Act becomes effective. *Id.* Section 5. The portion of the session law that explicitly states that the statute would not be retroactive is not, however, part of the enacted statute. Section 5 has been referenced by Georgia courts as evidence of legislative intent. *See Carson v. Obor Holding Co., LLC*, 734 S.E.2d 477, 479 n.1 (Ga. Ct. App. 2012). The Eleventh Circuit commented that Georgia's public policy did not change until the

Georgia legislature acted after the constitutional amendment passed.  *See Becham*, 482 F.

App'x at 391.

       The fundamental disagreement is how to determine, for the purpose of § 187(2)(b),

what Georgia's "fundamental policy" is with regard to the restrictive covenant in this case.

Viking Group argues that courts look at Georgia's current public policy.  Viking Group

points to the wording of the Restatement and authority from Michigan federal courts and

from authority outside Georgia and the Eleventh Circuit.   Pickvet argues that courts must

look at Georgia's public policy at the time the employment contract was signed.  Pickvet

points to federal and state courts examining Georgia law and which applied Georgia law that

existed at the time the restrictive covenant was signed.

       In determining whether the restrictive covenant is contrary to the fundamental policy

of Georgia, this Court will look at Georgia's current policy, as reflected in its existing statutes.

This conclusion is supported by opinions issued by several courts.  The earliest opinion was

issued by the Sixth Circuit in an unpublished opinion issued in 1988, *Monsanto Company

v. Manning*, 841 F.2d 1126 (6th Cir. 1988) (unpublished per curiam opinion).  Manning

started working for Monsanto in 1972.  He signed a noncompete agreement that included a

provision prohibiting Manning from using or disclosing confidential information.  When

Manning quit in 1987 and began working for a competitor, Monsanto filed the lawsuit

seeking to enforce the agreement.  Because the employment contract was completed in

Missouri, the court applied Missouri law.  The court concluded that with the 1985 repeal of

Michigan's prohibition on noncompete agreements, application of Missouri law to the

noncompete agreement would not be contrary to Michigan's public policy.  The court

explained that enforcement of the contract was "sought at a time when Michigan law does not prohibit such covenants as a matter of public policy." *Id.* at *5. Although this is an unpublished case, it persuasively demonstrates how the Sixth Circuit might resolve the current dispute.

A similar result occurred in the federal district court in Massachusetts in *Shipley Company, Incorporated v. Clark*, 728 F. Supp. 2d 818 (D. Ma. 1990). In *Shipley*, the defendant employees signed restrictive employment contracts in the late 1970s. The two defendants were Michigan residents and worked in Michigan. At the time, Michigan, by statute, generally prohibited noncompete agreements. The noncompete agreement, however, included a choice of law provision stating that Massachusetts law would govern any dispute. Michigan repealed its statute in 1985, and the new statute explicitly stated that it applied only to covenants entered into after March 29, 1985. The two defendants quit their employment in 1989, and their employer sought to enforce the noncompete agreements. The district court analyzed the situation using the Restatement for the Conflict of Laws, § 187, as required by Massachusetts law. The court carefully explained the issue that was presented.

> Accordingly, the proper inquiry is whether Michigan has a fundamental *public policy* that would be frustrated by the application of Massachusetts' substantive law, and *not* whether a Michigan court would void the covenant pursuant to a statute.

*Id.* at 826 (italics in original). The court explicitly found that enforcement of the choice of law provision might violate Michigan law, but it would not be contrary to Michigan's public

policy, "[b]ecause Michigan no longer has a public policy against no-compete agreements[.]" *Id.* at 826.

The holdings in *Monsanto* and *Shipley* were followed by the federal district court for the Eastern District of Michigan in *Park-Ohio Industries, Incorporated v. Carter*, No. 06-15652, 2007 WL 470405 (E.D Mich. Feb. 8, 2007). In *Carter*, the defendant employee started working for the plaintiff employer in 1978, when Michigan's public policy disapproved of restrictive covenants. The employer was an Ohio corporation and it asserted that Carter violated portions of his noncompete agreement when he resigned and began working for a competitor in 2006. The noncompete agreement contained a choice of law provision specifying that the agreement would be governed by Ohio law. Because the lawsuit was filed in Michigan, the district court applied Michigan's conflict of law rules, § 187. The court held that it had to consider Michigan's current public policy toward noncompete agreements, not what Michigan law stated at the time the contract was signed, pointing to both *Monsanto* and *Shipley*. *Carter*, 2007 WL 470405 at *7-*9. The court concluded

> the fact that Michigan's current and former laws would prohibit enforcement of the non-compete agreement in this case reflects only on Michigan law, not on its public policy. The existing public policy indisputably permits non-compete agreements[.]

*Id.* at *9. The court concluded that applying Ohio law, which permitted the enforcement of non-compete agreements, would not frustrate a fundamental Michigan public policy. *Id.*

Finally, in a similar situation, the Eastern District held that even though a contract might fail and be unenforceable for other reasons, those reasons do not establish that a noncompete clause would be contrary to a state's public policy. *See Kelly Servs., Inc. v.*

*Marzullo*, 591 F. Supp. 2d 924, 937 (E.D. Mich. 2008). In *Kelly Services*, the employer was based in Michigan and the employee, Manzullo, was based in Texas. Manzullo was hired in 1998. In 2007, after several promotions, Manzullo signed noncompete, nonsolicitation, and confidentiality agreements. In all of his employment agreements, Manzullo consented to jurisdiction in Michigan courts and each agreement identified Michigan law as the governing law. Manzullo resigned in 2008 to work for a competitor and Kelly Services then filed the lawsuit. The district court applied § 187 to determine whether Michigan law or Texas law would govern the matter. Although the noncompete agreements might not have been enforceable under Texas contract law for reasons of consideration, the court concluded that the agreements were not contrary to Texas' public policy, citing, among others, *Shipley*. *Kelly Services*, 591 F. Supp. 2d at 934-35.

This Court must acknowledge that Georgia courts, in both the federal and state legal systems, have reached the opposite conclusion. In *Bunker Hill*, the Georgia appellate court invalidated a forum selection clause contained in a noncompete employment agreement signed before Georgia changed its law. *Bunker Hill Int'l, Ltd. v. Nationsbuilder Ins. Servs., Inc.*, 710 S.E.2d 662, 667 (Ga. Ct. App. 2011). Conducting a conflict of law analysis, the court concluded that Illinois courts would likely enforce the agreement, but that the Georgia courts would not. *Id.* at 666. The court stated that it would apply Georgia law that existed at the time the contract was formed. *Id.* at 665 n.1. The court, however, failed to consider whether the change in the law constituted a change in Georgia's public policy, the critical

distinction on which the opinions cited above relied.[2]  In addition, all of the cases cited by court in the portion of the opinion that did discuss public policy were cases that applied then *existing* public policy and did not address situations where statutes and corresponding public policy had changed.  *Id.* at 665-66.

In *Boone*, the federal district for the Northern District of Georgia reconsidered an earlier ruling and followed *Bunker Hill* and two other opinions issued by Georgia courts to invalidate a choice of law provision in an employment agreement.  *Boone v. Corestaff Support Servs., Inc.*, 805 F. Supp. 2d 1362, 1369 (N.D. Ga. 2011).  The *Boone* opinion stated that the Georgia courts looked to Georgia's public policy at the time the employment agreement was made to hold that the agreements were unenforceable in Georgia.  *Id.*  But, as discussed above, *Bunker Hill* did not consider how, or even whether, the change in Georgia's law affected Georgia's public policy for the purpose of a conflict of law analysis. And, the other two state court opinions, *Gordon Document Products, Incorporated v. Service Technologies, Incorporated*, 708 S.E.2d 48 (Ga. Ct. App. 2011) and *Cox v. Altus Healthcare and Hospice, Incorporated*, 706 S.E.2d 660 (Ga. Ct. App. 2011), did not require

---

[2] In his response brief, Pickvet cites *Lapolla Industries, Incorporated v. Hess*, 750 S.E.2d 467, 475 (Ga. Ct. App. 2013) as further support for the conclusion that the change in Georgia's law should not affect the conflict of law analysis.  But, the *Lapolla* opinion suffers the same problem as the *Bunker Hill* opinion.  The court *assumed*, without any discussion, that the manner in which the court would analyze the enforcement of the noncompete and Georgia public policy were synonymous, even though a statute authorizing noncompete agreements had been passed since the agreement was signed.  The court did not even consider whether Georgia's current public policy with regard to restrictive covenants affected the conflict of law analysis.  *See also Carson*, 734 S.E.2d at 481 ("During the relevant time period, one such settled public policy in Georgia was that certain agreements in partial restraint of trade, if unreasonable, were unenforceable.").

a conflict of laws analysis. In both of those cases, the Georgia courts simply applied Georgia law to a Georgia employment contract.

The strongest statement in favor of applying Georgia's former public policy was made in *Becham v. Synthes (USA)*, No. 5:11-cv-73 (M.D. Ga. Sept. 14, 2011). In *Becham*, the federal district court for the Middle District of Georgia invalidated a choice of law provision in an employment contract. Examining *Bunker Hill*, *Boone*, *Gordon Documents*, and *Cox*, the court concluded that it must look at Georgia's public policy at the time the employment contract was signed, and not at Georgia's current public policy. *Id.* at *4-*5. As explained above, this Court has reservations that the precedent identified in *Becham* compels that conclusion.

Even if this Court could be convinced that Georgia state courts have held that they must look at past public policy for a conflict of law analysis, the Sixth Circuit in *Monsanto* and the Eastern District of Michigan's analysis of Michigan's law compels this Court to consider Georgia's current public policy when performing a conflict of law analysis.

## IV.

A district court has discretion to grant or deny preliminary injunctions. *Warshak v. U.S.*, 490 F.3d 455, 465 (6th Cir. 2007). When deciding a motion for a preliminary injunction, a court should consider and balance four factors: (1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief. *Id.* (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888

(6th Cir. 2000) (overruled on other grounds, *City of Littleton v. Z.J. Gifts D-F, L.L.C.,* 541 U.S. 774, 784 (2004)).  The four factors are not prerequisites that must be established at the outset, but are interconnected considerations that must be balanced together.  *Coal. to Defend Affirmative Action v Granholm,* 473 F.3d 237, 244 (6th Cir. 2006).

### A.  Success on the Merits

For this element, the Court must consider whether the noncompete agreement is enforceable.  The complaint filed by Viking Group contains a single count for breach of contract.  (*Viking Group* ECF No. 1-1.)  Viking Group argues Pickvet violated the terms of his post-employment noncompete agreement.  If the noncompete agreement is reasonable and enforceable, Viking Group will likely succeed on the merits.  The complaint filed by Pickvet also contains a single count, a request for a declaratory judgment.  (*Pickvet* ECF No. 1-1.)  Pickvet asserts that, under Georgia law, the post-employment noncompete agreement is unenforceable.  If the noncompete agreement is not reasonable and is unenforceable, Pickvet will likely succeed on the merits.

Viking Group has demonstrated a likelihood of success on the merits.  To the extent that any portion of the noncompete agreement is unreasonable, the Court may limit the agreement to make it reasonable and enforceable.

Having concluded that the Court must apply Michigan law to the noncompete agreement, Pickvet has not demonstrated a likelihood of success on the merits.  Pickvet's motion assumes that Georgia law would be applied.  In the discussion below, the Court notes what Georgia's current statute permits for noncompete agreements in order to show that enforcing the agreement would not be contrary to Georgia's current public policy.

Both Michigan and Georgia have enacted statutes which allow reasonable restrictive employment covenants. The Michigan statute allows employers to obtain noncompete agreements "which protect[] an employer's reasonable competitive business interests" when the agreement "is reasonable as to its duration, geographical area, and the type of employment or a line of business." Mich. Comp. Laws § 445.774a(1); *see Innovation Ventures v. Liquid Manufacturing*, 885 N.W.2d 861, 873 (Mich. 2016) (indicating that § 445.774(a) is the "proper framework to evaluate the reasonableness of noncompete agreements between employees and employers."). The Georgia statute allows similar restrictions in noncompete agreements. The statute allows "enforcement of contracts that restrict competitive during the term of a restrictive covenant, so long as such restrictions are reasonable in time, geographic area, and scope of prohibited activities[.]" Ga. Code Ann. § 13-8-53(a).

The proposed preliminary injunction contains multiple restrictions on Pickvet. The proposed injunction includes limitations based in time (duration) and space (geographic area). The propose injunction contains limitations on competition with potential customers and limitations on the solicitation of existing customers. The proposed injunction includes a restriction on recruiting. It also contains restrictions on retaining and using confidential information. Anyone of the individual restrictions could be reasonable in isolation, but when combined with the other restrictions, it could become unreasonable.

### 1. Duration

The two-year duration of the noncompete agreement is reasonable under Michigan and Georgia law. Both Michigan and Georgia law allows noncompete agreements to

continue after employment for a reasonable amount of time. "With respect to duration, Michigan courts have not provided any bright line rules. Rather, they 'have upheld non-compete agreements covering time periods from six months to three years.'" *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 547 (6th Cir. 2007) (citation omitted); *e.g., Rooyakker & Sitz, PLLC v. Plante & Moran, PLLC*, 742 N.W.2d 409, 418 (Mich. Ct. App. 2007) (upholding as reasonable a two year agreement preventing the former employees from providing the same accounting services to former clients). By statute, Georgia has established a rebuttable presumption that restrictive covenants up to two years are reasonable. Ga. Code Ann. § 13-8-57(b). Even under Georgia's strict scrutiny review of restrictive covenants prior to 2011, Georgia courts found that restrictive covenants that lasted for two years were reasonable. *E.g., Azzouz v. Prime Pediatrics, PC*, 675 S.E.2d 314, 319 (Ga. Ct. App. 2009).

### 2. Geographic Scope

Like duration, Michigan courts have not imposed any strict limitations on geographical restrictions in noncompete agreements. *Certified Restoration Dry Cleaning Network*, 511 F.3d at 547. Under Michigan law, geographic limitations in noncompete agreements must be tailored to protect the employer's legitimate business interests, a determination which is inherently fact specific. *Capaldi v. LiftAid Transp., LLC*, No. 267981, 2006 WL 3019799, at *4-*5 (Mich. Ct. App. Oct. 24, 2006) (per curiam). "The standard for reasonableness of geographic limitations in restrictive covenants is whether they are no greater than reasonably necessary to protect an employer's legitimate business interests." *Kelly Servs.*, 591 F. Supp. 2d at 939 (finding reasonable geographical limits

restricting the employee from working for a competitor in the same geographical territory where he worked for his former employer). Where an employer conducts business on a worldwide scale, Michigan courts have held a restriction on the former employee can be imposed that prevents the employee from competing in the global market. *Superior Consulting Co., Inc. v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994). Under the Georgia statute, noncompete agreements must be reasonable in geographical limitation. Ga. Code Ann. § 13-8-53(a). The statute specifies that nonsolicitation agreements need not identify specific geographical restrictions, but must instead limit contact with the employer's customers or prospective customers with whom the employee had material contacts. *Id.* § 13-8-53(b). Under Georgia's old law, any geographic limitation in a noncompete agreement must have been narrowly tailored to the area where the employee actually worked. *Paramount Tax & Accounting, LLC v. H&R Block Eastern Enterprises, Inc.*, 683 S.E.2d 141, 146 (Ga. Ct. App. 2009).

When combined with the other restrictions, the geographic limitation in the nonsolicitation provision is overbroad. Pickvet is restricted from working for a competitor in ten states, even though he only sold products and services in five of those states. With the exception of Georgia, Pickvet sold products and services in only limited areas in those five states. Where courts have sanctioned broad geographical limitations, the noncompete or nonsolicitation agreement contained fewer restrictions on other activities. For example, in *Superior Consulting*, the restrictive covenant lasted only six months and the former employee was prohibited from soliciting existing clients of the former employer and potential clients, which were defined as those entities that had been subject to "sales or marketing

activity, other than mass mailings, within six (6) months prior to the employee's termination date." 851 F. Supp. at 841. The geographical limitations, in combination with the other restriction in Viking Group's proposed order, under Michigan law, is not sufficiently tailored to protect Viking Group's legitimate business interests.[3] *See Mapal, Inc. v. Atarsia*, 147 F. Supp. 2d 670, 678-79 (E.D. Mich. 2015). Georgia, under the new statute and the old law, would also find the restrictions overly broad.

### 3. Current and Potential Customers

Viking Group's proposed injunction prohibits Pickvet from selling to existing Viking customers and potential customers. Both Michigan law and the Georgia statute would find reasonable a nonsolicitation limitation on existing customers of the former employer, as well as prospective customer with whom the employer or the former employee had contact. *Superior Consulting*, 851 F. Supp. at 842; Ga. Code Ann. § 13-8-53(b). Michigan courts have reasoned that a restrictive covenant is reasonable when it protects against the employee from getting an unfair advantage in competition with the former employer, without prohibiting the employee from using general knowledge or skill. *Rooyakker & Sitz*, 742 N.W.2d at 418. Restricting a former employee from soliciting business from individuals and entities with whom he had a prior relationship or material contact is reasonable.

---

[3] Viking Group cites *Owens v. Hatler*, 129 N.W.2d 414, 406 (Mich. 1964) for the proposition that Michigan law would support very broad geographic limitations in restrictive covenants for employees. But, *Owens* and the cases cited in that opinion, involved the sale of businesses where noncompete provisions were placed on the former business owner or partner.

### 4. Confidential Information

The proposed injunction also prohibits Pickvet from retaining, disclosing, or otherwise using any of Viking Group's confidential information.  Under Michigan law, restrictions on former employees from using confidential information in an anticompetitive manner is reasonable.  *Rooyakker & Sitz*, 742 N.W.2d at 418.  The Georgia statute allows employers to include confidentiality restrictions.  Ga. Code Ann. § 13-8-53(e).  By prohibiting Pickvet from soliciting current Viking Group customers, the noncompete agreement prevents Pickvet from exploiting confidential information about those customers. Viking Group contends Pickvet had access to other confidential information, including pricing, product cost, technical data, marketing strategies, and other business information.

Viking Group contends Pickvet can exploit his access to its confidential information when submitting quotes to potential customers, which would give Pickvet and his new employer a distinct and unfair advantage in pricing.  Viking Group claims that, one week before he resigned, Pickvet downloaded to a thumb drive, information about his existing customers and other customers of Viking Group.  He also downloaded pricing information about special types of projects.  Viking Group insists that Pickvet had no reason to download this information while he was an employee, because he could access it any time.

The Court agrees that Pickvet's decision to access and save to a thumb drive confidential information one week before leaving Viking Group is concerning.  Restricting Pickvet from soliciting Viking Group customers is a reasonable restriction that minimizes his ability to exploit the confidential information.  Prohibiting Pickvet from using or sharing that information is also reasonable restriction.  To prevent Pickvet from exploiting this knowledge

when in competition with Viking Group for new customers, the Court concludes that some additional limitation must be in place, such as geographical restrictions.

### 5. Blue Pencil or Reformation

Both the Michigan statute and the current Georgia statue allow courts to "blue pencil" or limit the restrictive agreement to make it reasonable.  Mich. Comp. Laws § 445.774a(1) (providing that "a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited."); Ga. Code Ann. § 13-8-53(d) (providing that a "court may modify a covenant that is otherwise void and unenforceable so long as the modification does not render the covenant more restrictive with regard to the employee than as originally drafted by the parties.").

To balance Viking Group's reasonable business interests with Pickvet's own interest in employment and his reasonable expectation to be able to use general sales knowledge, the Court will enforce the noncompete and nonsolicit agreements for territory where Pickvet actually sold products and services for Viking Group.

### 6. Other Considerations

In his motion, Pickvet identifies a number of other concerns in the noncompete agreement, all of which can be resolved by limiting the restrictive agreement to make it reasonable.  Pickvet supports each of these concerns, and attempts to show that each is not reasonable, by citing opinions issued by Georgia courts.

First, Pickvet argues the definition of "the Company" in the noncompete agreement is overbroad.  The noncompete agreement prevents Pickvet from competing against Viking Corporation, all of its parents, subsidiaries and affiliates, and any joint ventures, partnerships

or other business entities, as well as their successors and assigns. Pickvet argues that the breadth of this restriction is unreasonable because the agreement does not provide sufficient notice; he does not know which business entities are covered or what services and products they sold. To remedy the lack of notice, the noncompete could be limited to prohibiting Pickvet from selling services and products similar to the ones he was selling. This limitation resolves the notice problems.

Second, Pickvet argues that the remedies section is overbroad. Specifically, Pickvet points to the provision that allows the noncompete to be extended beyond two years if the agreement is breached after leaving Viking Group, and before a court order is issued. To remedy this potential extension of time, the noncompete could be limited to two years after Pickvet left his job.

### B. Irreparable Harm

Viking Group has established the likelihood that it would suffer irreparable harm if without a preliminary injunction. Pickvet had access to confidential pricing information from Viking Group. In situations where Pickvet and Viking Group are bidding competitively against each other for future projects, Pickvet's knowledge would make the competition unfair. And, Pickvet's access to information about Viking Group's existing customers would make solicitation of those customers unfair. In both situation, Pickvet's access to Viking Group's confidential information creates the threat of an irreparable injury to Viking Group. *See Kelly Servs., Inc. v. Noretto*, 495 F. Supp. 2d 645, 659 (E.D. Mich. 2007).

Pickvet has not established the likelihood of irreparable harm. Pickvet asserts that, without an injunction on the enforcement of the noncompete agreement, he would likely be

terminated. The loss of income, standing alone, is not ordinarily an irreparable injury. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). Equally problematic, Pickvet has not supported this argument with evidence. On the record before this Court, it is not clear if Pickvet is currently employed by Winsupply. The complaint is not verified. In the complaint, Pickvet asserts that he has received an offer from a competitor and "wishes to accept this offer[.]" (*Pickvet*, ECF No. 1-1 PageID.23.) In the affidavit attached to his motion for a preliminary injunction, Pickvet states that he has "agreed to new employment with Atlanta Winsupply[.]" (*Pickvet* ECF No. 1-1 PageID.44.) Pickvet does not state that he is currently receiving a paycheck from Winsupply, nor does Pickvet state that if the noncompete is enforced he would be terminated from Winsupply.

## C. Harm to Others

Viking Group has established that the harm to others if an injunction were to issue would be minimal. Pickvet would be restricted from soliciting business from entities with which he formerly had a relationship. Pickvet would also be restricted from selling fires suppression equipment and services in the same geographic areas he formerly serviced. Pickvet would not be restricted from selling fire suppression equipment altogether.

Were the Court to refrain from issuing an injunction, Pickvet has not established that the harm to Viking Group would be minimal. Pickvet attempts to minimize the potential injury to Viking Group by describing the company's total financial picture. Were that the standard, larger companies would almost never be entitled to enforce a noncompete agreement against an individual employee. A more apt comparison would be to consider

the harm to Viking Group in the area were Pickvet intends to work.  From that perspective, the threat to Viking Group from competition by Pickvet is not negligible.  Were the Court to refrain from enforcing the noncompete agreement, Viking Group would likely suffer unfair competition in those markets.

### D.  Public Interest

This element does not favor either party.  The public has an interest in robust, but not unfair, competition.  The public also has an interest in the enforcement of reasonable contracts.  Both states currently have a public policy favoring reasonable restrictive covenants and both states currently allow courts to refine restrictive covenants in order to enforce them as reasonable.  Enforcing a limited version of the restrictive covenant will not undermine the competitive market for fire suppression systems.  Failing to enforce the noncompete agreement, however, risks introducing unfair competition into the market for fire suppression systems, at least on the area where Pickvet would be working,

### V.

The Court will grant Viking Group's motion for a preliminary injunction, but will modify the proposed injunction.  The Court will issue the requested preliminary injunction, but will limit the geographic scope to those areas where Pickvet worked for Viking Group.  By limiting the geographic scope to those areas where Pickvet had clients, the Court protects Viking Group's reasonable business interests from unfair competition, while allowing Pickvet to use his general sales knowledge of fire suppression systems.

## ORDER

Consistent with the contemporaneously issued Opinion, Viking Group's motion for a preliminary injunction (*Viking Group* 1:17-cv-103 ECF No. 4) is **GRANTED IN PART** and Pickvet's motion for a preliminary injunction (*Pickvet* 1:17-cv-116 ECF No. 2) is **DENIED.**

Preliminary Injunction

Until further order of this Court, or until January 23, 2019, whichever occurs first, Terry Pickvet is prohibited from:

A.  attempting to persuade any customer or supplier of Viking Group that they should not continue to do business with Viking or should reduce their purchases of Viking products or services, or should do business with a competitor of Viking Group;

B.  selling or aiding in the sale of any products or services that are competitive with any services or products of Viking Group in the state of Georgia, in the counties where he served customers on behalf of Viking Group in the southern-half of Alabama, the panhandle region of Florida, and in the counties where he served customers on behalf of Viking Group in the Chattanooga and Cleveland areas of Tennessee and in Lucedale, Mississippi;

C.  soliciting, encouraging or persuading any employee of Viking Group to terminate their employment with Viking or to take any action that adversely affects their ability to carry out their employment duties with Viking;

D.  Retaining, disclosing to any person or entity, or using for any purpose any confidential information concerning Viking Group's customers, marketing strategy, product costs, pricing information, or other business information which he obtained in the course of his employment with Viking.

**IT IS SO ORDERED.**

Date:  May 3, 2017                           /s/ Paul L. Maloney
                                             Paul L. Maloney
                                             United States District Judge